**Petitions for NATURALIZATION OF Rostico Alili ALACAR, Felix Baclig Castillo, Cresencio Camero, Sr.**

**Nos. 665–P–Tr. No. 124, 665–P–22031, 665–P–22355.**

United States District Court
D. Hawaii.
July 3, 1961.

Carlos Ramelb, Honolulu, Hawaii, for petitioners.

TAVARES, Chief Judge.

In these two cases the facts are as follows:

Petitioner Rostico Alili Alacar, hereinafter called Alacar, a native and national of the republic of the Philippines, was lawfully admitted for permanent residence at Honolulu, Hawaii on December 9, 1927, and he was physically present in the United States continuously during the period from December 9, 1927 to January 22, 1957 and from February 25, 1958 up to the time of filing his petition for naturalization on July 14, 1958. On January 23, 1957, he left Hawaii for Midway to take up employment with Hawaiian Dredging Co., Ltd., a Hawaii corporation, engaged in contract work for the military authorities of the United States on Midway, and worked there in such employment until he returned to Hawaii on February 25, 1958. The total period of time he was continuously absent from the United States while in the employ of said company on Midway was 13 months and 3 days, or one month and three days more than a year. He did not at any time apply to the United States Immigration and Naturalization Service (hereinafter called the Service) to preserve his residence in the United States for naturalization purposes pursuant to Section 316(b) of the Immigration and Nationality Act of 1952 (8 U.S. C.A. § 1427(b)), hereinafter called the 1952 Act.

Petitioner Felix Baclig Castillo, hereinafter called Castillo, a similar native and national of the republic of the Philippines, was lawfully admitted for permanent residence at Honolulu on November 18, 1924, and he was physically present in the United States continuously during the period from November 18, 1924 to October 18, 1951 and from December 1, 1955 to August 23, 1956, and from July 29, 1958 to the time of filing his petition for naturalization on May 23, 1960. On October 18, 1951, he went to Kwajalein to take up employment with Mid Pacific Contractors, a group of United States contractors doing business for the military on Kwajalein. He re-

mained on Kwajalein to December 1, 1955 when he returned to Honolulu. On August 23, 1956, he went to Midway where he was employed with Hawaiian Dredging Co., Ltd. until July 29, 1958. The total period of time he was continuously absent from the United States while in the employ of the Hawaiian Dredging Co., Ltd. on Midway was 23 months and 7 days or 11 months and 7 days more than a year. Like Alacar, Castillo did not at any time apply to the Service to preserve his residence in the United States for naturalization purposes pursuant to said Section 316(b), (8 U.S.C.A. § 1427(b)).

## Issues and Discussion.

In these two matters and in a third matter (Petition No. 665–P–22355, of Cresencio Camero, Sr., presenting similar issues, not decided herein because it was continued on request to September, 1961) the General Attorney for the Service filed Findings of Fact and Conclusions of Law and Recommendations, in which the General Attorney held that Midway was not included in the definition of "United States" as used in Sections 101(a) (38) and 316(a) of the 1952 Act (8 U.S.C.A. §§ 1101(a) (38), and 1427(a)).[*1]

*1. 8 U.S.C.A. § 1101(a) (38) reads as follows: "The term 'United States', except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States."

8 U.S.C.A. § 1427, subsecs. (a) and (b) read as follows: "(a) No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his petition has been physically present therein for periods totaling at least half of that time, and who has resided within the State in which the petitioner filed the petition for at least six months, (2) has resided continuously within the United States from the date of the petition up to the time of admission to citizenship, and (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

"(b) Absence from the United States of more than six months but less than one year during the period for which continuous residence is required for admission to citizenship, immediately preceding the date of filing the petition for naturalization, or during the period between the date of filing the petition and the date of final hearing, shall break the continuity of such residence, unless the petitioner shall establish to the satisfaction of the court that he did not in fact abandon his residence in the United States during such period.

"Absence from the United States for a continuous period of one year or more during the period for which continuous residence is required for admission to citizenship (whether preceding or subsequent to the filing of the petition for naturalization) shall break the continuity of such residence, except that in the case of a person who has been physically present and residing in the United States, after being lawfully admitted for permanent residence, for an uninterrupted period of at least one year, and who thereafter is employed by or under contract with the Government of the United States or an American institution of research recognized as such by the Attorney General, or is employed by an American firm or corporation engaged in whole or in part in the development of foreign trade and commerce of the United States, or a subsidiary thereof more than 50 per centum of whose stock is owned by an American firm or corporation, or is employed by a public international organization of which the United States is a member by treaty or statute and by which the alien was not employed until after being lawfully admitted for permanent residence, no period of absence from the United States shall break the continuity of residence if—

"(1) prior to the beginning of such period of employment (whether such period begins before or after his departure from the United States), but prior to the expiration of one year of continuous absence from the United States, the person has established to the satisfaction of the Attorney General that his absence from the United States for such period is to be on behalf of such Government, or for the purpose of carrying on scientific research

Section 316(a) supra requires five years of continuous residence within the United States during the five years immediately preceding the date of filing the petition, and physical presence therein, and Section 316(b) (8 U.S.C.A. § 1427(b)) *1 provides for breaking the continuity of residence if a person has been physically absent from the United States for a continuous period of one year or more, with the exception (insofar as relevant to those cases) that, if a person is absent because of employment by or under contract with the government of the United States and prior to the beginning of the period of employment the person has established to the satisfaction of the Attorney General that such absence is for such purpose, etc., then the continuity is not broken. In the Alacar case, since no such application was made, the question is squarely presented as to whether Midway was included within the term, "United States", as used in said sections 101(a) (38) and 316(a).

In an earlier decision *2 of this court, rendered on November 2, 1959 by Judge Chase Clark, acting under assignment to this court, this contention by the government in a number of similar cases was rejected, and Judge Clark held that Midway was included within the term, "Hawaii", as used in Sec. 101(a) (38) of the 1952 Act, and therefore was a part of the United States as so defined. The Service, in effect, has asked this court to overrule Judge Clark's previous decision. In this connection, it it noted that the United States filed a Notice of Appeal on December 8, 1959 and an Amended Notice of Appeal on December 10, 1959 in the Acosta and consolidated cases, but on January 7, 1960, for reasons which do not appear, the United States filed a Withdrawal of Appeal, thereby allowing Judge Clark's ruling to become final.

on behalf of such institution, or to be engaged in the development of such foreign trade and commerce or whose residence abroad is necessary to the protection of the property rights in such countries in such firm or corporation, or to be employed by a public international organization of which the United States is a member by treaty or statute and by which the alien was not employed until after being lawfully admitted for permanent residence; and

"(2) such person proves to the satisfaction of the court that his absence from the United States for such period has been for such purpose."

*2. Petition for naturalization of Teofilo Niteba Acosta, Nat.Pet. No. 665–P–20826 and other petitions consolidated therewith. Because Judge Clark's decision appears not to have been previously published, it is quoted in full as follows:

"The applicants for citizenship in this case, it is admitted, are well qualified in every respect to be admitted to citizenship except the Immigration and Naturalization authorities contend that under the provisions of Section 316 of the Immigration and Nationality Act they have failed to fulfill the requirement of five years continuous residence by reason of their taking employment temporarily on what is known as Midway Islands during that period of time.

"Under the provisions of Section 316 of the Act, as regards continuous residence, reference is made to 'Absence from the United States'. In Section 101(a) (38) of the said Act United States is defined as the continental United States, Alaska, Hawaii, Puerto Rico, Guam and the Virgin Islands.

"It is the opinion of this Court that at least prior to the Hawaii Statehood Act enacted March 18, 1959, the Midway Islands were included in the definition of United States under the use of the term 'Hawaii', that not being limited as 'Territory' or 'Island', but merely reference to 'Hawaii'. The Court feels this is further evidence by the fact that Congress saw fit to specifically set forth in the Hawaii Statehood Act that the 'State shall not be deemed to include Midway Islands', apparently feeling that unless excluded they would be included as part of the new State of Hawaii.

"For these reasons there was no departure from the United States, and the Petitioners have fulfilled the requirement of five years continuous residence in the United States immediately preceding the filing of their Petitions for Naturalization.

"The recommendation of the designated examiner that the Petitions for Naturalization be denied will be overruled.

"Dated this 27th day of October, 1959."

Once such a ruling has been made in this court, it would seem that the same ought to be followed until reversed by higher authority, unless on the face of it the decision is patently erroneous.[3] But for the writer's intimate connection with the statehood movement, in which he appeared and testified along with others concerning Midway, Judge Clark's opinion would have been followed as a matter of course. However, the writer has conducted considerable research on the question, including a rather minute examination into the history of the Immigration and Nationality Act of 1952, of the previous Nationality Act of 1940 (54 Stat. 1137), and other Acts, including the Act admitting Hawaii to Statehood (Act of March 18, 1959, 73 Stat. 4, 48 U.S.C.A. note preceding section 491), together with Hawaii statehood bills going back as far as 1953, from which the Midway provisions of the 1959 Act are essentially derived. As a result of this research, hereinafter discussed in more detail, while there is considerable evidence supporting the government's position, I do not feel that

error is so clearly manifest in Judge Clark's decision that I am justified in overruling it, particularly in the light of the government's dismissal of the previous appeal.

It must, of course, be admitted that, historically, from shortly after the time of annexation of Hawaii to the United States, with a few exceptions or ambiguous situations, the Midway Islands (sometimes called "Midway Island") were generally not considered, either by the local governmental authorities of the Territory of Hawaii, or by the federal authorities, as part of the Territory of Hawaii.[4]

On the other hand, there are indications, in the Hawaii State Constitutional Convention proceedings of 1950 and also the 1953 Senate hearings cited in note 4, that at least a possible claim might be made by Hawaii to the Midway Islands, although the main argument in the Statehood Hearings centered around whether Palmyra Island should be excluded from the proposed state, even though apparently conceded by all to have been a part of the Territory of Hawaii.[5]

*3. "Unless a judge can say that he thinks a decision of a colleague is on the face of it patently erroneous, he should follow it. Especially is this true of * * * decisions in different cases involving rules of practice and procedure or rules of property or, as here, the status of persons * * * ". Mathes, J., in Rojas-Gutierrez v. Hoy, D.C.S.D.Cal.1958, 161 F.Supp. 448, 451.

*4. See comprehensive historical data filed by the Hawaii Statehood Commission with the Senate Committee on Interior & Insular Affairs at the first Hawaii Statehood hearings which questioned the proposed boundaries and geographical areas to be included in the proposed State of Hawaii, referred to in Hearings before the Committee on Interior & Insular Affairs, U.S. Senate, 83d Congress, 1st and 2nd Sessions on S. 49, S. 51, HR 3575, Part 2. June 29, 30, July 1, 2, 3, 6, 7, 9, 11, 1953, Jan. 7 and 8, 1954, at pages 147–149. For brevity this volume of hearings is hereinafter referred to as the "1953–4 Senate Hearings". See, also, testimony of Delegate Farrington and C. Nils Tavares, then Chairman of the Hawaii Statehood Commission, in the same

1953 Senate Hearings, pp. 41–43, 45, 47, 50–51, 62–63, 72–74, 119–121, 123, 124, 130, 132, 144, 147–149.

*5. Thus, at the hearings before the Committee on Miscellaneous Matters of the Hawaii State Constitutional Convention, which convention drafted and adopted the present Hawaii State Constitution (except for a few changes required by Congress in the 1959 enabling Act), it was agreed, pursuant to the advice of Miss Rhoda V. Lewis, then Deputy Attorney General, now Associate Justice of the Hawaii Supreme Court, and an authority on this subject, that the proposal relating to state boundaries should be *broad* in composition, whereupon the Committee adopted *the broadest possible description of boundaries* using the words, "The islands and territorial waters heretofore constituting the Territory of Hawaii shall be known as the State of Hawaii". (Minutes of Committee, May 31, 1950, Archives of Hawaii).

See also that part of the testimony of C. Nils Tavares, Hawaii Statehood Commission chairman, set forth on pages 84–87 of printed Hearings before the Subcommittee on Territories and Insular

The Senate Interior and Insular Affairs Committee then chairmaned by Senator Hugh Butler, and especially Senators Anderson and Jackson, in the 1953-4 Senate Hearings, raised the question as to what were the boundaries of the areas included in the proposed Hawaii State Constitution and the statehood bills then and previously introduced in Congress, and for the first time in statehood hearings the question was raised by Congress as to whether the proposed State would have a possible claim to the Midway Islands. At this time the tidelands question was very much in the minds of the Senators, and, in view of the claims made by the tideland states based on their early history, the Senators suddenly were very wary of any claims that might be made by Hawaii, both as to lands above and below sea level, and as to contiguous waters. Even the power or authority of the Delegate to Congress from Hawaii and the Hawaii Statehood Commission and delegates from Hawaii, to waive any territorial claims that might be made by Hawaii in the future, were sharply questioned by the Committee, especially through Senator Anderson.[*6]

Possessions of the Committee on Interior and Insular Affairs, House of Representatives, 83rd Congress, 1st session, on HR 21, HR 49, HR 205, HR 1745 and HR 2981, Feb. 23, 24, 26 and 27, 1953, pages 84 to 87 in which he says, "* * * but there are two islands in that area, Johnston and Midway Islands, that the Hawaiian Kingdom and the Hawaiian Republic claim title to, but when we came into the United States, we knew that the United States also claimed those islands by a virtue of its own acts with respect thereto. Both the Hawaiian Kingdom and the United States landed on these two islands and took possession, but in the sequence of events the United States said it had prior claim and we yielded to that. When we came into the United States we yielded our rights and have never questioned it since. So we do not consider Midway and Johnston Islands as part of the Hawaiian Islands". However, the witness then suggested that all islands, including Midway, should ultimately be included in the State for municipal law purposes and convenience.

On pages 85 to 87 of the same Hearings, there was inserted in the record a memorandum of Rhoda V. Lewis, Deputy Attorney General to Mr. Leon Ben Ezra, dated March 29, 1951, showing the historical background and claims of the Territory of Hawaii to Midway and Johnston Islands, Miss Lewis stating that *these islands were in the "doubtful category".* (Emphasis added.)

In that memorandum reference is also made to the Act of Congress of August 13, 1940, 54 Stat. 784, as amended by the present section 91 of Title 28 U.S.C., giving the Hawaii Federal Court jurisdiction over the Midway Islands, etc., and commenting that this action of Congress was *not conclusive because the Act* also expressly included *Kure Island* and, of course, Kure had always been considered a part of the Territory of Hawaii.

The memorandum then distinguishes between the *islands in the "doubtful category"* and those clearly not included in the Territory of Hawaii, by using the following language: *"Islands which definitely are not part of the Territory of Hawaii are Wake,* * * *",* etc. (Emphasis added).

*6. Thus, at page 41 of the 1953-4 Senate Hearings, supra, Senator Anderson questioned whether Delegate Farrington had "authority to abandon the claim of the Territory of Hawaii", referring particularly at the time to Territorial waters, but, by inference, to any other claims the Territory might have as to boundaries, since the exclusion of Palmyra and other islands was also being considered. At page 45, Senator Anderson argued that we ought to define the boundaries more specifically and to limit them exactly. Senator Jackson, on the same page, stated:

"I think that is important, because if my recall serves me correctly, and I want to be corrected, Mr. Farrington, on the floor of the House the question was asked about the boundaries, the boundary lines of the proposed State of Hawaii. Whoever was on the floor in charge at the time could not answer the question * * *. I was flabbergasted when this bill came over to find that in the legislative history of the bill nobody knew where the boundary lines were, either as to Palmyra, and all the way up to Midway, and the area around the islands. The record disclosed that it was nothing but confusion, and no one could answer a specific question on the floor of the House when this bill was passed."

Although the statehood bills did not pass at the 1953–4 sessions of Congress, or at subsequent sessions until 1959, a study of the same will make it clear that the final form of the Statehood bill that passed in 1959, insofar as the boundaries of the State are concerned, which expressly excluded the Midway Islands, Johnston Island and Palmyra Island, derives from this session and these particular hearings before the Senate Interior Committee, above cited. And it is also clear that, from then on, Congress insisted that the boundaries of the proposed State, as proposed to be more narrowly defined by Congress, *should be expressly ratified by the people of Hawaii* at an election in which they would *expressly relinquish any claim to the excluded islands.*

Notwithstanding, therefore, the strong admissions made by emissaries from Hawaii (Delegate, Statehood Commission members and other witnesses) in the course of the hearings—to the effect that the Midway Islands were not considered a part of the Territory—and the impressive historical data submitted along the same line, including opinions of Territorial Attorneys General cited in the very able findings and recommendations of the General Attorney for the Service, supra, I am unable to say that Judge Chase Clark's conclusion that there was some indication in the Hawaii Statehood bill that Hawaii had at least a claim to the Midway Islands when the 1952 Act was passed, is totally without supporting evidence and therefore patently erroneous on its face.

My research as to the history of the 1952 Act and previous immigration and nationality statutes, with special reference to the outlying possessions of the United States such as Midway, has also disclosed some additional evidence tending to support Judge Clark's decision, but adequate treatment of the same would unduly lengthen this decision.

### Conclusions of Law.

The rulings in the decision of Judge Clark, quoted ante, Note 2, are adopted at the conclusions of law in this case, and it is held that the petitioners Alacar and Castillo have fulfilled the requirement of five years continuous residence in the United States immediately preceding the filing of their Petitions for Naturalization.

The recommendation of the General Attorney for the Service that the Alacar and Castillo Petitions for Naturalization be denied is overruled. The administering of the oath of allegiance will be withheld for thirty days from the date of filing this decision. At any time after such thirty-day period, unless the government has filed an appeal, petitioners Alacar and Castillo may take the oath of allegiance and will then be admitted to citizenship in accordance with this decision.